UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

_____

DOUGLAS DREIST,                         )
                                        )
        *Plaintiff*,                    )
                                        )
        v.                              )        Civil Action No.  1:16-cv-368 (LO/TCB)
                                        )
WASHINGTON GAS LIGHT CO., *et al*.      )
                                        )
        *Defendant*s.                   )
_____)

_____

MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

_____

Sharon Fast Gustafson
Attorney at Law, PLC
Virginia Bar No. 32800
6047 N. 25th Street
Arlington, Virginia  22207
(703) 527-0147
sharon.fast.gustafson@gmail.com

Attorney for Plaintiff Douglas Dreist

# TABLE OF CONTENTS

SUMMARY OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     Dreist has set out a *prima facie* case of race discrimination.. . . . . . . . . . . 2

    II.    Dreist has set out a *prima facie* case of retaliation.. . . . . . . . . . . . . . . . . . 3

           A.     Denial of consideration for first Manager,
                 Customer Experience position.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
           B.     Denial of consideration for Manager, Customer Care Position.. . . 3
           C.     Non-Selection for Manager, Customer Experience Position.. . . . . 4
           D.     Performance Memo... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
           E.     Performance Warning and Kool-Aid Video
                 to Human Resources.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
           F.     Suspension.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
           G.     Termination... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    III.   Who Made the Termination Decision, and When Was it Made?. . . . . . . 7

    IV.   There are Genuine Issues of Material Fact.. . . . . . . . . . . . . . . . . . . . . . . . 11

    V.    WG's Alleged Reasons Are Riddled with Evidence of Pretext.. . . . . . . . 25

           A.     Changing rationale.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
           B.     False Statements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
           C.     Discrepancies.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
           D.     Timing... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
           E.     Failure to follow WG's policies and practices.. . . . . . . . . . . . . . 28
           F.     Better treatment of worse behavior.. . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

_____

DOUGLAS DREIST,                                )
                                               )
        *Plaintiff,*                           )
                                               )
        v.                                     )          Civil Action No.  1:16-cv-368 (LO/TCB)
                                               )
WASHINGTON GAS LIGHT CO., *et al.*             )
                                               )
        *Defendant*s.                          )
_____)

_____

MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

_____

In this fact-intensive case of race discrimination and retaliation, Defendants Washington

Gas Light Co. and WGL Holdings (herein jointly "WG") have moved for summary judgment,

asserting that there is no genuine issue as to any material fact as to Plaintiff's claims.  WG filed

its motion for summary judgment before the beginning of discovery.  Plaintiff must oppose it

very early in discovery, without yet having received relevant requested documents, which

Plaintiff believes would be further strengthen his opposition.  The facts relevant to this case are

stated in full in the Plaintiff's Statement filed herewith, and in the memorandum accompanying

Plaintiff's opposition to WG's motion to dismiss.  Those facts can be summarized as follows:

SUMMARY OF FACTS

Plaintiff Douglas Dreist was a 35-year employee of Defendant WG.  For his last 12 years,

he was a member of management who consistently received positive performance ratings.

1

Mr. Dreist is Caucasian--a minority race in his department at WG.  He was denied a promotion in favor of an African-American applicant whom WG admits had objective qualifications inferior to Mr. Dreist's.  When Mr. Dreist complained of racial discrimination, he was fired.  Washington Gas's justification for the firing--that Mr. Dreist's circulation of a link for a humorous, innocent video was supposedly racist--was manifestly a pretext for its retaliation, in view of the manifestly non-racist nature of the video, the company's attempt to paint Dreist as a racist despite long-term co-workers' remarks that he was not racist at all, the close timing between the complaints and the adverse action, Washington Gas's shifting rationale for the firing, and the drastic character of the firing in comparison to its mild response to racist or other serious infractions by other employees.

## ARGUMENT

The law here is simple.  It is unlawful for an employer to discriminate in employment based on race or to retaliate against an employee for complaining about such discrimination. Section 1981 and 42 USC 2000e-2(a)(1) and 3(a).  Plaintiff disagrees with Defendant, not primarily about the law, but about the application of the law to the facts of this case.

I.      Dreist has set out a *prima facie* case of race discrimination.

As to the filling of the Acting Manager, Customer Services position, WG filled the position with a less-qualified African-American employee without posting the position and giving Dreist an opportunity to apply for it.  *Taylor v. Milllenium Corp*, (1:15-cv-1046, E.D.Va 2016 at 11(relaxing the application requirement of a prima facie case and stating "employer could evade a failure to promote charge by essentially never providing the employee with an opportunity to apply").  Dreist was more qualified for the position than was the African-American person whom WG selected for the position. Dreist St. pp. 7-8, ¶¶ 23-28.   After that,

2

Dreist began making complaints of race discrimination.  The adverse actions that followed his complaints could be viewed as race discrimination, retaliation for complaints of discrimination, or some combination of the two.  We discuss those adverse actions in this section on retaliation:

II.     Dreist has set out a *prima facie* case of retaliation.

Because he complained to managers (Shaver (about 12/13), Hudson (about 11/14), Coates (about January or February 2015)) and to HR personnel (Gutermuth (about 02/14) and the group of HR representatives (03/11/15)) that promotion decisions were being made on the basis of race rather than qualifications (and later also that he had been denied an interview and issued a baseless performance memo), WG took adverse action against him.  These actions are both discriminatory and retaliatory.

A.      Denial of consideration for first Manager, Customer Experience position.

In April 2014, Dreist applied for the Manager, Customer Care position the first time it was posted.  He was the person most qualified for it.  Dreist St. p. 9, ¶ 30.  Coates, the eventual selectee for the position,  had not even applied for the position the first time it was posted.  Because Dreist had complained to Hudson (and to Shaver and Gutermuth) about race discrimination, rather than filling the position, Hudson removed the posting, divided it in two, and wrote new position descriptions (one in a manner that favored Stephanie Jackson, the African-American who had been promoted as Acting Manager.  Dreist applied for both of the two new  positions.  Dreist St. 9, ¶¶ 31-32.

B.      Denial of consideration for Manager, Customer Care Position.  Because Dreist had complained to Hudson (and to Shaver and Gutermuth) about race discrimination, WG denied Dreist the opportunity to interview for the position of Manager, Customer Care, and

falsely claimed that Dreist had withdrawn his application for that position.  WG promoted into

that position the African-American candidate whom it had discriminatorily previously promoted

into the Acting Manager position.

    C. <u>Non-Selection for Manager, Customer Experience Position</u>.  For discrim-

inatory and/or retaliatory reasons, WG selected for the revised Manager, Customer Experience

position an African-American employee with markedly less experience and qualifications in all

of the relevant subject areas.  Hudson Dep. 113-17, 131-32; Dreist St. pp. 10-12, ¶¶ 37-41;

Coates Dep. 7-9, 11, 29, 49-50, 88.  That Dreist was objectively better qualified for the Manager,

Customer Experience position in terms of experience and technical and subject matter knowledge

is beyond dispute.  Tanya Hudson, Dreist's manager and the decisionmaker, has so admitted.

Doc 4.2, para. 13 ("I had initially expected Dreist to be the highest scoring applicant based on his

experience"); Hudson Dep. 77 (Dreist "was the supervisor over the team that did the day-to-day

work.  He oversaw their work, he communicated with key account customers.  He managed the

workload of those employees"); Id. at 78 ("From a technical and subject matter basis," there were

no other applicants for the position who had better experience for the position).

   It is a hotly contested material fact whether Dreist said something "racially tone deaf" at

his interview or did anything else that justified his low interview ratings or whether those low

interview ratings were instead pretext for discrimination and retaliation.  For Dreist's interview,

rather than having each interviewer fill out a matrix scoresheet with that reviewer's rating for

each employee in each competency, the group collaborated and completed a single matrix

scoresheet.  Hudson Dep. 85-87.  This was not the practice at WG for interviews that Dreist sat

on.  Dreist St. p. 12, ¶ 45.  And the manner in which WG completed a single matrix scoresheet

for the interviews for Manager, Customer Experience makes it impossible to determine how each interviewer rated Dreist in each competency.  It suggests that Dreist's low scores (and Coates's high scores) resulted from Hudson, who appeared to be leading the interview, making known to the group her preference for filling the position (and thereby rating the candidates).

    D. <u>Performance Memo</u>.  Very soon after Dreist complained of race discrimi-nation to Coates, Coates began to take adverse action against Dreist, beginning with a perform-ance memo that was baseless in fact and was written to set Dreist up for further adverse action.

    E. <u>Performance Warning and Kool-Aid Video to Human Resources</u>.  Coates then forwarded to HR a humorous Kool-aid video, stating that some employees had found it to be derogatory and racist.  The employees who allegedly so complained were the same employees who had chuckled about it and seemed to enjoy it when Dreist sent the link.  None of the four employees who received the link complained to Coates that it was racist (Coates Dep. 111-13, 115, 128-32, 175) or complained  to HR,  except Coates who went to HR 7 weeks after receiving the video and fewer weeks after Dreist had complained about discrimination.  Brown Dep. 56.

 When HR, during an "investigation,"  raised the question of whether the video was offensive, Michael Bell said the video was stupid but he was not offended by it.  Exh. 8, 0523, Brown Dep. 22.  Daphne Johnson said, "It's a little offensive" but that she did not think there was malice on Dreist's part.  Exh. 8, 0391.  Wardell Washington said that "if he didn't know" Dreist, it would have "rubbed him the wrong way."  Exh. 8, 0525.  Though Brown asked them "a couple of times" for detail about what they found offensive, "They didn't go into detail."  Brown Dep. 49-50.  Employees made these comments before Dreist knew that there were offensive words associated with the video.  If he had known about those words, he would have apologized

immediately, sparing anyone offense.

Coates was retaliating against Dreist when he forwarded the video to HR with a statement that some felt it was derogatory and racist.  This can be seen both by (1) the fact that Coates waited until after Dreist complained of race discrimination to do anything about the video and (2) the much more lenient and less punitive way Dreist responded to another employee who purposefully called someone the "n" word.  When a Caucasian employee complained that Darchelle Jackson (AA) had called a co-worker the "n" word, Coates did not refer the matter to HR or discipline Jackson.  He simply told her not to use that word in the workplace.  Coates never spoke to Dreist about the video (other than to acknowledge receipt of it), and he never spoke to Dreist about the offensive comments on the webpage (though Dreist, too, did not see those comments the first time he viewed the video).  Instead, Coates waited seven weeks and then forwarded it to HR as part of a disciplinary process.

F.   <u>Suspension</u>.  When Dreist asked Edwards, the African-American in-house counsel who was questioning him about the video, if Edwards found the video to be racist, she said that she did not.  Dreist explained that he did not find the video to be derogatory or racist and that he had no idea that there were any comments written on the webpage that hosted the video.  He apologized if he had sent anything with derogatory or racist comments attached to it.  Brown Dep. 148-49.  He explained that he believed that he had been discriminated against on the basis of his race when he was, among other things, passed over for several promotions in favor of less qualified African American employees, denied an interview for a promotion, and given a baseless performance memo.  Dreist was suspended at the conclusion of that meeting, and not permitted to return to his desk to collect his personal belongings.

G.     Termination.   The sole complaint in Coates's email forwarding the video to HR was that some team members allegedly felt it was "derogatory and racist."   The sole reason WG gave Dreist when it terminated his employment was that he had sent a link to a video that was "derogatory and racist."   Exh. 8, 0348;   Brown Dep. 207-10.   The sole reason WG gave the EEOC was Dreist's actions were "viewed as derogatory and racist."   Exh. 6 at 7.   Any additional "reasons" for Dreist's termination that WG alleges now are evidence of pretext.

WG had given Dreist positive ratings for his ability to manage a diverse workforce, and in his 35 years at WG, Dreist had never received a complaint of racism.   Brown Dep. 57-60.   Coates does not think that Dreist is racist.   Bridnetta Edwards, the company's African-American in-house labor lawyer, told Dreist that she did not find the video racist.   When Brown interviewed the two employees who were allegedly offended by the "racist" video and asked them for detail about how they found it to be racist or offensive, the employees would say only that it was racist and they were offended by it.   When WG questioned Dreist about the video, Lynn Brown repeatedly stated that the lyrics to the video include the "n" word, but they do not.   The video link was a pretext for discrimination and retaliation.

III.     Who Made the Termination Decision, and When Was it Made?

WG has been playing a shell game as to who made the decision to terminate and when that decision was made.   In its EEOC position statement, WG is silent as to who decided to terminate Plaintiff and when.   In its summary judgment brief, Defendant evasively says that "[o]n March 11, 2015, Lynne Brown ... and Bridnetta Edwards ... met with Dreist to complete the investigation into the video, culminating in a formal termination,"   Def. Mem. para. 25. The meaning of this is ambiguous and does not answer the question of when WG decided to

terminate Dreist.  WG also says "Dreist points to ... a complaint he made on March 11, 2015 *after* WG had made the decision to fire him".   But this contradicts what WG told Dreist and its other employees about not making a termination decision until after April 10, 2015.   Hudson Dep. pp. 8-9, 84-85 (Q: What was the purpose of the March 11, 2015, meeting?  A: It was to get more information from Doug and talk to him about the seriousness of - of what was going on..... Were there any other purposes to the meeting? ... A: No.")

In response to interrogatory no. 1 asking WG to "identify all persons who had any role in the decision to discharge Plaintiff and [to] describe in detail the involvement of each person in the making or carrying out of that decision, including the dates of all such involvement," WG answers only "Emily Roller terminated Plaintiff on April 14, 2015, based on recommendations by Lynne Brown and Bruce Atkinson."  Exh. 7.  Brown first testified that no one had decided to terminate Dreist as of the March 11 meeting.  Brown Dep. 83-85.  Later she testified that Emily Roller had decided to terminate him by that time.  Brown Dep. 95-96.  Emily Roller, however, testified at deposition that she made the determination to terminate Dreist in the sense that she wrote and signed a termination letter when Bruce Atkinson told her to.  Bruce Atkinson told Lynne Brown that "he had *heard* that there was going to be a termination [of] Doug Dreist ...." Brown Dep. 111.  Atkinson also told Brown just before the March 11 meeting, "We are going to be talking with - with Doug today, and there might be a possible termination.  We haven't gotten the green light for that yet."  Id. 135-38.  According to Brown, the termination recommendation was made by Roller and Edwards, but "there might have been other people involved."  HR "get[s] input" from managers and supervisors.  Tanya Hudson was involved in the decision to terminate Dreist.  Roller also consulted Coates.  Brown Dep. 112-16.  Brown told Dreist the

decision was made by "several levels of management ... Tanya [Hudson], Bridnetta [Edwards],... Emily [Roller] and Everett Coates."  Id. 115-16.  Bridnetta Edwards "may have made a recommendation ...."  Id. 131.  In response to interrogatory no. 2 asking WG to "identify the person(s) who made the determination to terminate Plaintiff and state the date the determination was made," WG responds only "Washington Gas Human Resources terminated Plaintiff on April 14, 2015."  Exh. 7.  None of these equivocal and contradictory responses answers this foundational question in a retaliation case: Who made the decision to fire Plaintiff, and when did he or she make that decision?  This should not be a difficult question to answer.

Hudson denies making the decision to terminate Dreist, Hudson Dep. 8, but she admits she recommended Coates give Dreist a performance warning a few weeks before he actually did so,  Hudson Dep. 51, 53, and Hudson admits that one of the two women from HR who "investigated" both Dreist's sending of the video link and Dreist's complaints of race discrimination, asked Hudson "if the decision was made not to terminate [Dreist] would I be comfortable with him coming back to the group, and I said no, I wasn't."  Hudson Dep. 11-12, 40.  In approximately one month, Hudson contacted Brown in HR five or six times and attorney Edwards three or four times to ask whether Dreist was going to be terminated.  Hudson Dep. 28, 32.  Brown communicated to HR that she wanted Dreist to be fired and that she was eager to learn that it had been accomplished.

For purposes of summary judgment, the Court should assume that Hudson made the decision to terminate Dreist[1] because he complained to her of race discrimination in late October

---

[1]"Q: Have you terminated anybody else in your group other than Andrew Teal and Doug Dreist?  A: No."  Hudson Dep. 67.  "[H]ow many people have you had a role in terminating since you've been there?  "Two."  Hudson Dep. 111.

2014; that Coates helped her do it because Dreist complained to him of discrimination sometime in January - February 2015, and that WG approved the decision because Coates complained to HR of race discrimination on March 11, 2015.  This is Plaintiff's theory of the case, and the evidence supports it.

This chronology explains why Hudson signed off on Dreist's positive performance evaluations on October 13, 2014, before he complained to her of discrimination; it explains why Hudson made up the story about Dreist withdrawing his application for the Manager, Customer Care position around October 31, 2014; it sheds light on the absurdly low ratings that Dreist received on his interview for the Manager, Customer Experience position on October 31, 2014; it explains why on February 23, 2015 (upon Dreist's return from vacation), Coates gave Dreist a baseless performance memo requesting him to do an impossible non-urgent task within the next 30 days; it explains why Coates was working with HR on a performance warning for Dreist on March 3, 2015, even though Dreist was complying with all of Coates's requests in his February 23 performance memo; it explains why Coates waited seven weeks to forward the video link to HR on March 3, 2015; it sheds light on why Rodriguez (Hudson's new boss) refused Dreist's request for a meeting (February 26, 2015) but instead forwarded Dreist's request to the ombudsman in HR[2]; it explains why HR took no steps to learn the nature of Dreist's concerns behind his request for a confidential meeting with Rodriguez; it explains why WG called Dreist into a meeting of 5 HR representatives on March 11, 2015, without anyone first discussing the

_____

[2]The ombudsman is the person people go to if they "feel like they are working in a hostile work environment" or if they have "race discrimination complaints."  Brown Dep. 14.  "There's a communication that goes out annually ... if you have EEO concerns, discrimination, harassment, contact Lynne Brown."  *Id*. 80.

video with Dreist; it explains why WG sent Dreist home on March 11, 2015; it explains why WG

terminated him on April 14, 2015; and it explains why WG won't say who made the decision to

terminate Dreist or when that decision was made.

IV.     There are Genuine Issues of Material Fact.

This is a fact-intensive case, and Defendant's "Statement of Undisputed Facts" does not

begin to state those facts -- which have barely begun to be developed in discovery.  Defendant

states that "the material facts are not in dispute," but Defendant omits many relevant facts and

characterizes as "undisputed" assertions that, in fact, are hotly disputed.

WG omits any reference to these material facts: 1) that WG moved Jackson into an

Acting Manager position, though Dreist was more qualified; 2) that when WG first posted the

Manager, Customer Experience position, Dreist was the most qualified candidate who applied for

it so WG divided the position into two positions and changed the job requirements; 3) that Dreist

continued to be more qualified than Coates; 4) that Dreist had ten years of positive performance

appraisals; 5) that Dreist complained multiple times of race discrimination; 6) that Dreist

cooperated with and responded to Coates's "your performance" memo; 7) that Dreist apologized

for unknowingly sending a link to a web-page that contained derogatory terms; and 8) that WG

regularly gives employees with serious infractions much more lenient discipline.

Defendant asserts the following much-disputed facts:

- 5.  That employees are notified "to contact Ombudsman Lynne Brown with an EEO complaints or concerns.

Employees at WG are taught that they may communicate discrimination concerns to

any supervisor or manager.  Dreist St. ¶ 108; Coates Dep. 105.

11

- 13-14. That "Dreist withdrew his application for the Manager, Customer Care position because he had applied to the position in error."  Def. Mem. 1-2, 5-6, ¶ 13-14 ("Dreist has not interviewed for the position because he had withdrawn his application.")

Dreist applied for the Manager, Customer Experience position and the Manager, Customer Care position, and he never withdrew his application for either position, and he never said anything to suggest that he was even considering withdrawing his application for either position.  Dreist St. p. 13, ¶32.  This is an allegation that WG appears to have contrived after it filed its position statement with the EEOC.  Exh. 6, p. 4.

- That Dreist alleges no pretext for his non-selection to these positions other than offering further self-serving conclusions that he was better qualified.  Def. Mem.2.

Dreist offers the decisionmaker's testimony that he was objectively better qualified.  His performance appraisals and the position descriptions also are evidence that he was better qualified.  See Coates Dep. 7-9, 11, 29, 49-50 (Coates's lack of qualifications).

- 17. That Dreist was the "lowest scoring applicant" for the position.  Def. Mem. 6, paragraphs 15-17.

One of the positions (Acting Manager) was filled without being posted.  The second Manager position was withdrawn after he applied for it.  The third position (Manager, Customer Care was filled without his being interviewed.  The fourth position, (Manager, Customer Experience), Dreist was most qualified for, in part because he had ten more years of experience in the relevant subject areas.  It was filled with a less-qualified African-American man who admitted to Dreist that he knew nothing about several key aspects of the job.  The low performance ratings were retaliatory and discriminatory.

- 15. That "[f]or the Manager, Customer Experience position, four applicants were selected to be interviewed by an independent panel ....  Six individuals were on

12

the interview panel ...."  Def. Mem. 6, para 15.

Dreist had only five interviewers on his panel, rather than the six claimed by Defendant.

- 17.  That, during his interview for the Manager, Customer Experience position, "Dreist made a comment about 'Hispanics' and their ability to pay bills, and made sarcastic jokes throughout the interview that the panel found inappropriate."

Dreist made no sarcastic jokes during the interview.  As to any comments about

"'Hispanics' and their ability to pay bills," Dreist describes part of his interview for the Manager,

Customer Experience position:

> During my interview for the position of Manager, Customer Experience, I was asked about what I had done and what I would do to improve customer experience.  As part of my response, I explained that I had worked on the cash payment study and had implemented a process that provided approximately 300 authorized payment agent locations where customers can make cash payments at little or no cost.  I discussed the fact that Washington Gas had recently shortened its business hours at its company-owned walk-in offices  (closing at 4:00 rather than later), and I discussed the need for Washington Gas to be sensitive to the particular bill-paying needs of its various populations.  As an example, I said that I had received several calls from apartment managers telling me that their residents were unable to conduct office transactions between 8:00 a.m. and 4:00 p.m. because of their sometimes multiple jobs.  I talked about the fact that many of our customers wanted to pay their bills only at locations where the person behind the counter spoke their language.  I believe I mentioned in particular the Spanish speakers who preferred using a walk-in center in Sterling where the owner spoke Spanish.  I did not use the word "Hispanic," in any derogatory way.  I did not feel negatively toward nor do I speak negatively about Hispanic or Latino people.  Ruben Rodriguez, whom I am aware is Hispanic and who was one of my interviewers, responded positively to me throughout my interview and told me that I sounded as if I had learned the interview questions in advance. ...

As to the "Cash Payment Study" that Dreist had worked on for WG at the direction of the

Maryland Public Service Commission and that Dreist  was describing during his interview:

> The problem was that WG had ... too few payment locations, open too few hours, where unbanked or underbanked customers (who were often minority or immi-grant populations) could pay their gas bills at low or no cost.  Some customers incurred wire fees of $13.95 to pay a small monthly gas bill.  I learned that, in

13

general, WG's poorest customers incurred the highest fees associated with paying their bills.  I viewed my job to be finding ways to correct this discrimination.

Though Dreist does not agree with Hudson's recounting of the conversation regarding Hispanics, hers sounds less sinister than the picture WG tries to paint.  Hudson Dep. 100.

It is contrived and cynical for WG to turn any benign and practical mention of race or ethnicity into some kind of racist statement.  Dreist was applying for the position of a manager of customer service.  It was altogether appropriate for him to discuss his concern about meeting the practical bill paying needs of all of WG's constituencies.

- 19.  "That the only racial discrimination objection Dreist points to is a complaint he made on March 11, 2015 after WG had made the decision to fire him."  Def. Mem. 4, p.1.  "Dreist did not make any formal complaints to WG's Human Resources, the WG Ombudsman Lynne Brown, or to his Division Head about his non-promotion to either position as due to race."  Def. Mem. p. 7, ¶19.

As set out in detail in his sworn statement, Dreist complained of race discrimination four or five times before WG decided to terminate him, including to Shaver (manager), Gutermuth (HR VP), Hudson (manager), and to Coates (supervisor), and to the HR group.  Dreist St. p. 8, ¶¶28-29; p. 10, ¶36; p. 19, ¶71-73; p. 28, ¶¶106-109.  Dreist was not required to complain to Brown, nor would have done so because he was aware of her engaging in inappropriate behavior in the workplace and he would not have trusted her with his complaint.  Dreist St. p. 28, ¶109.

WG says only that Dreist did not make any *formal* complaints to certain persons.  Neither Title VII nor Section 1981 requires an employee who complains to a supervisor or manager of race discrimination to use any formality when making the complaint.

That Hudson was aware of Dreist's race discrimination complaint even before he explicitly made that complaint to her is suggested by the fact that she called in Dreist and

14

questioned him about HR's report to her that he had complained that she had "dumbed down" the Manager, Customer Experience position.  Dreist St. p.9, ¶33.

That Dreist's supervisor and human resources  were in communication about Dreist after he complained of discrimination is evident from the March 3 email chain showing Coates (manager), Gutermuth (HR), Edwards (legal), and others communicating about issuing him a performance evaluation.  Exh. 8, 0555-58;  Hudson Dep. 43-45.  That the company knew about Dreist's discrimination complaint is suggested by the fact that when Dreist emailed his new director, Rodriguez, a request for a confidential meeting to discuss departmental concerns, Rodriguez forwarded it to WG's HR ombudsman Brown who WG claims is the person designated to receive EEO complaints.  Also, Hudson testified that she was in contact with Shaver about the possibility of issuing a performance warning to Dreist. Hudson Dep. 57. All of the people whom Dreist had complained to were communicating with each other about what to do about Dreist.

- That Dreist "admittedly sen[t] a video with sexual and racial content to his staff and supervisor." Def. Mem. 1.

Dreist admits sending a humorous video to his staff and supervisor in an attempt to lighten the mood after a strained staff meeting, but he denies sending a video that was derogatory to anyone on account of that individual's race or sex.  Dreist explained to WG that, after a tense staff meeting, "he sent it jokingly... to lighten people's spirits ..., and he did not think it was racist."  Brown Dep. 146-47.

Dreist explained to WG that he did not see any comments associated with the video and would not have sent it had he known there were derogatory comments associated with it.  Coates himself testified that he did not see any comments associated with the video the first time he

15

viewed it.  This corroborates Dreist's assurances to WG that he was totally unaware that there were any comments associated with the video at the time that he sent it.

When WG questioned Dreist about sending a link to a video, he was told that an unnamed person found the video to be racially offensive.  The termination letter that WG sent to Dreist told him that he was being terminated for sending a link to a video that was racially offensive. WG told the EEOC that Dreist was fired for sending a racially derogatory video.  The suggestion that Dreist was fired for sending a video with sexual content is a new allegation made up for purposes of litigation.

- 20.  That Dreist sent a "video [that] violated the company's Information Technology policy, Fair Employment Practices, and Code of Conduct."

Taken together, the policies cited by Defendant prohibit employees from discriminating against, harassing, denigrating, disparaging, threatening, intimidating, or showing hostility or aversion to people on the basis of race or sex (or other protected categories), Def. Mem. 2-4, ¶¶ 3, 4, 6.   The video that Dreist sent a link to was humorous and innocent.  It did not do what any of the cited policies forbid.

- 20.  That the video "contain[ed] clips of dancing animals and women of different races (Asian, African-American) dancing in what could reasonably be perceived as a sexualized manner."  Def. Mem. 7, para. 20.

The four-minute humorous video to which Dreist sent a link contains animated clips of nearly a dozen animals, Kool-Aid pitchers, stick figures and Caucasian, African-American, and possibly Asian cartoon characters dancing.  The video includes more Caucasian characters than characters of other races.  The lyrics to the video contain no racial (or sexual) content.

- 21. That the video link included "a section for viewers to post comments about the video.  The posted comments included several inappropriate remarks ...."  Def.

16

Mem. 7, para. 21.

The video appears to have been produced by a young African-American amateur music producer.  Dreist knew nothing about him at the time that he sent the link to the Kool Aid song. Dreist simply googled "Kool Aid song," found what looked like a light-hearted humorous video, and shared it.  Dreist St. ¶ 68.

Two of the comments below the video on the webpage where the video appeared -- which Douglas Dreist was unaware existed at the time he shared the video link -- include both the words "LOL" [laughing out loud] and "n---a."  Dreist agrees that "n---a" is an entirely inappropriate word that should not be used.  Dreist neither uses nor condones the use of the word.  As Dreist explains in his sworn statement:

> Ms. Edwards asked me if I was aware of the comments following the video.  I said I was ***not*** aware that there were any comments following the video. Ms. Edwards said the video and the comments contained derogatory language.  I explained that I was unaware of anything derogatory in the video and that I did not know that there were any comments associated with the video.   Ms. Edwards said that "n" word was used, and she asked me if I use that word.  I said that word is not a part of my vocabulary and I do not use it.

> Lynne Brown, ombudsman, insisted repeatedly that the audio portion of the video included the "n" word.  I insisted that was not true.

> I explained that I had just sent the video in an effort at sharing humor.  I said that I did not think the video was racist or derogatory.  Ms. Edwards told me that someone had complained that the video was racist.  I asked Ms. Edwards if she thought the video was racist or derogatory.  She said that she did not think it was racist but that she thought it was sexist.

> In that meeting, I was asked the same questions over and over again.  I explained that I never would have sent a link to the video if I thought it had anything racist or derogatory in it. I said that I did not know it had comments attached, and that I was sorry if I had forwarded a link to something with racist or derogatory comments.

17

Dreist St. p.28,  ¶¶101-105; Brown Dep. 149.

Dreist did not use the offensive word.  Rather, unbeknownst to him and entirely by accident, he forwarded a link to a video that included comments in which two other people in a conversation in which they were laughing out loud ("LOL") used a variant of the word.

WG racially discriminates with regard to its sensitivity to this offensive word and the discipline it meets out to one who uses it.  WG declined to discipline an employee who intentionally used the "n" word in the workplace.  Instead, Coates simply told her not to use the word at work again.  Dreist St. p. 31, ¶124.  By comparison, WG terminated Douglas Dreist, a loyal hard-working 35-year employee with a good performance record, after he apologized for unknowingly forwarding a video link that contained two comments in which others had used a variant of the offensive word.  The disparity in treatment is evidence of discrimination and pretext for retaliation.

- 9 and 22.  That "[t]wo months prior to his termination, in February 2015, Dreist received a "performance memorandum" from his supervisor Everett Coates.  This performance memorandum warned Dreist about his 'negative responses when responding to general work issues' and failing to produce the required 'written work flow of daily work' when requested from his supervisor.  If Dreist did not improve his performance, it would result in a negative notation on his annual performance review.  Def. Mem. at 4, para 9, and

  That "[s]oon after [Dreist sent the video link], Coates e-mailed an informal "performance memorandum" to Dreist warning him about the need to "use appropriate workplace behavior at all times," "[use] sound judgment", and "demonstrate professionalism in the workplace."  Def. Mem. at 8, para. 22.

These two alleged "materials facts not in dispute" that are separated by 12 paragraphs in WG's recounting of the story of Dreist's termination refer to the same one-page memo entitled "your performance" that Coates gave to Dreist on February 23, 2015.  Exh. 8, 0343.

18

This is a red herring as no one has ever suggested that Dreist was terminated related to his work performance.  Prior to Defendant's motion for summary judgment, Dreist was told only that he was terminated for sending a link to a racially offensive video, which Defendant's African-American employment counsel did not herself find to be racially offensive.  Furthermore, the "performance memorandum" threatened, not discharge from employment, but "a negative notation on [a] performance review."  In response to a interrogatory seeking "all the reasons Defendants discharged Plaintiff," Defendants cite only the video.  Exh. 7, Rog. 4 response.

Notably, the memorandum that Coates gave to him "two months prior to his termination," did not mention the video link, nor had Coates ever mentioned the video link to Dreist, other than to confirm that he had received it.  Dreist St. p. 19, ¶70.

As for whether the memo was given "soon after" Dreist sent the video link and "two months prior to his termination", Dreist sent the video link on January 14, 2015.  Seven weeks later, on February 23, 2015, Dreist was given the memo "re your performance."  The only notable thing that occurred between Dreist's sending of the video link and Coates's issuing the performance memo was Dreist's complained to Coates about race discrimination.  Nine days after the performance memo, on March 4, 2015, Coates forwarded the video link to HR.  One week later, on March 11, 2015, WG sent Dreist home from work, never permitting him to return again.

The February 23 memorandum from Coates was retaliatory.  In January or February, Dreist had complained to Coates that the selection process was racially discriminatory.  Coates had responded by asking Dreist when he planned to retire.  A few weeks later, Coates gave Dreist a memorandum about his "performance," but Coates seemed entirely uninterested in discussing its allegations with Dreist.  Coates testified that this memo was not a performance warning.

19

Coates Dep. 156-57; Brown Dep. 16 (Dreist did not receive a performance warning.)

Dreist discusses each of the memo's false allegations in his sworn statement:

When Dreist spoke to Coates about the memo:

> [A] ll he said to me was that he was waiting to get written processes.  I reminded him that the processes were currently hosted on the shared drive.  I asked him which type of process he was requesting since there are multiple variations.  He responded, "I need processes."  He did not identify any particular type of process. I told him that I would pull the processes from the drive and email them to him. Coates said, "Okay"....  Coates said nothing to elaborate on anything written in the memo.   He said nothing in criticism of my ability to supervise, and he gave no examples of inappropriate workplace behavior.  He shared with me no concerns from my direct reports.  He gave no examples of any problems he thought I had with independent thinking, sound judgment, or professionalism.  He did not mention monthly staff meetings which I was already holding.  He did not mention the classes or training that ... I was regularly taking ....

> I knew from 35 years' of employment at WG, that something very strange was afoot.  Coates's conversation with me did not match up at all with the memo he had written me.  I concluded that he was setting me up to terminate my employment because I had raised with him and others my concern about discrimination at WG.

In addition to the allegations and insinuations not matching Coates's comments, they did not match Dreist's 2014 performance evaluation which rated him as meeting or exceeding all of the expectations for his position and commented positively on, among other things, his ability to supervise, his "daily performance and decision-making,"  (Ex. 8, 0319), and his Individual Development Plan which included training classes and conferences (Ex. 8, 0310).

Hudson, had concluded Dreist's 2014 Supervisor, Partner Management/Key Accounts evaluation by saying that she knew "that with [Doug's] experience and skills, we will be successful ....  Thank you Doug."  Exh. 8, 0325.  That good will evaporated when Dreist complained of discrimination.

20

- 24. That "WG conducted an investigation into the circumstances surrounding the video, including interviewing Dreist's employees who had felt the video was 'derogatory and racist.'" Def. Mem. 8, para. 24.

When WG spoke to Dreist about the video, WG said that a single employee had felt the video was "derogatory and racist."  In its motion for summary judgment, WG alleges that multiple employees found the video to be derogatory and  racist.  WG's ramping up of the breadth of the alleged employee complaint is evidence of pretext.

WG alleges two contradictory things.  One is that it met with Dreist on March 11, 2015, "to complete the investigation into the video." Def. Mem. at 8, para. 25.  And Brown admits that "a complete investigation" would require a conversation with Dreist to learn his motivation for sending the video.  Brown Dep. 116-17.  WG's second allegation is that it had already decided before it met with Dreist on March 11, 2015, that it was going to terminate him.  One of two things is true.  Either (1) WG made a decision to terminate a 35-year employee without even speaking with him about the reason for his termination or giving him any opportunity to address it -- a fait accompli -- which violates WG's usual practice and suggests retaliation; or (2)  WG was merely conducting an investigation and had not yet decided whether or how to discipline Dreist for the video link, which suggests that Dreist's race discrimination complaint during that investigation sealed his fate at WG, resulting in his termination.  Either inference supports Dreist's retaliation claim.

Two things are clear: six weeks after Dreist emailed Coates the video link, Coates had threatened Dreist with merely *a negative comment on his next performance appraisal*.  After March 11, when Dreist complained of race discrimination to the HR panel of five, WG decided not to give him a negative comment on his next performance appraisal, but to terminate him.

21

- 25. That "[a]fter being told [on March 11, 2015] the video was grounds for termination, Dreist stated, for the first time, that he had been subject to a "hostile work environment" based on his race." Def. Mem. at 8, para 25.

Dreist had complained of race discrimination several times prior to March 11, 2015, and he complained of race discrimination on March 11, 2015, without ever being threatened with termination. Dreist was not told that day that the video link was grounds for termination. Dreist was told only that he might be placed on leave. Dreist St. p. 29, ¶110.

- 27. That "the termination was stayed, to complete the investigation into Dreist's hostile work environment claim." Def. Mem. para. 27.

Defendant says that at the March 11, 2015, meeting, WG told Dreist that "the video was grounds for termination." This is false. Dreist St. ¶110; Brown Dep. 147. WG then says that "because of Dreist's complaint, the termination was stayed to immediately investigate Dreist's concerns." Def. Mem. at para. 26. This implies but does not state that WG had decided prior to the March 11, 2015, meeting to terminate Dreist's employment before it had ever even spoken to Dreist about the video link. This seems to be in contradiction of WG's representation that the March 11, 2015, meeting was part of an investigation related to the video. Furthermore, Coates's has testified that there were no termination plans as on March 11, 2015. Ombudsman Brown testified that the purpose of the March 11, 2015, meeting was to tell Dreist that sending the video was a serious offense and to get his side of the story. Hudson Dep. 83-84.

At the March 11 meeting, Dreist explicitly complained of race discrimination, and the only "investigation" that WG did of those complaints was that Lynne Brown spoke to his supervisor Coates and his manager Hudson -- the two people who had retaliated against Dreist for his prior discrimination complaints -- and decided that Dreist's hostile environment claim

22

was not substantiated.  Brown Dep. 148-70, 175-82.  WG did not investigate Dreist's complaints.

- 29.  That WG terminated Dreist "for sending a video in violation of WG's Fair Employment Practices Policy statement, IT policy, and Code of Conduct.  Def. Mem. 9, para. 29.

The termination letter that WG sent to Dreist began: "On or about March 4, 2015, a complaint was made to Human Resources that you sent a You-Tube video to your supervisor and three other employees, including two direct reports, which was perceived as 'derogatory and racist.'" Def. Exh. I.

The complaint that was made to Human Resources on March 4, 2015, was made 7 weeks after Douglas Dreist sent the video link on January 14, 2015.  WG first brought the video link to Dreist's attention on the day that it suspended his employment -- 8 weeks after he had sent the video link.  This suggests that the complaint arose not because of the video link, but for some other reason.  Dreist is confident that the complaint arose in retaliation for his complaint of race discrimination.  The close timing between his race discrimination complaints and his termination is evidence of pretext.

The fact that WG failed to follow its usual procedure of giving an employee a written warning prior to terminating him, Dreist St. p.4, ¶8, and the fact that termination in this instance was a discipline that far exceeded any infraction (if there was an infraction) are two additional bases on which a reasonable jury could find pretext.  *Id.*; *Joyner v. Fillion*, 17 F.Supp.2d 519, 526 (E.D.Va. 1998).  In the last 15 years, WG has terminated only two employees for violations of the company's IT policy.  Both of these employees were guilty of gross IT violations in that they had downloaded and/or shared pornography on WG's computers.  Exh. 8, 0543 (" you have sent pornographic emails to employees and others using company equipment and on company

23

time"); Exh. 8, 0542 ("you were regularly accessing and viewing pornographic content ... on your

company-issued laptop ... [including] thousands of pornographic images and approximately 170

minutes of video showing you and other individuals behaving in sex acts").  These infractions are

not comparable to the alleged infraction that Dreist was accused of.

- 30.  That "there is currently no restriction on [Dreist's] attending shareholder meetings, going to the credit union, or attending Quarter Century Club meetings." Def. Mem. 9, para. 30.

On April 14, 2015, WG told Dreist that "effective immediately you may not enter any

company facility or property without prior authorization from Security Services.  The Company

will treat any unauthorized entry of Company Facilities by you as trespass."  Def. Exh. I, p. 2.

Dreist was given no instruction about how he would go about getting prior authorization from

Security Services.  He does not know whom he would talk to or what he would need to do or

show in order to obtain the authorization.  He would be embarrassed to speak with people in

WG's security office and explain that he was forbidden to enter the property without prior

authorization from Security Services.  This hurdle is high enough to effectively preclude him

from entering company property, thereby prohibiting him from attending shareholder meetings,

going to the credit union, or attending Quarter Century Club meetings.  Dreist St. p. 31, ¶122.

- 31.  That "Dreist was later mailed boxes containing his personal possessions." Def. Mem. 9, para. 31.

WG has refused to return to Dreist many of Dreist's personal items, even though Dreist

has made repeated requests that the items be returned to him and has provided detailed

information about where in his office these things could be found.  The missing items include

photos (including an antique mounted photo) a certificate and associated training manual for the

LEED Green Associate certification, his box with his business cards, several folders marked personal that were in his desk drawers, and a reusable shopping bag filled with Dreist's personal belongings.  Dreist St. p. 31, ¶21.  This refusal to return personal property is illegal and it is retaliation for Dreist's complaints of race discrimination.

- That WG treated Dreist as it treats other employees who violate the IT policy.

WG's policy explicitly permits personal use of WG's IT resources.   The examples WG gave of employees who violated the IT policy are in sharp contrast to Dreist's alleged violation. Dreist did not intent to violate the policy at all, and he immediately apologized when he learned that derogatory words appeared in comments below the video.  The employees whom WG points to as comparators were involved with viewing, storing, and/or distributing multiple pornographic images at the workplace.  They are not remotely similar to Dreist.

- That WG began an investigation upon learning of Plaintiff's complaint on or about March 11, 2015.

WG learned of Dreist's race discrimination complaint soon after WG promoted Stephanie Jackson to Acting Manager, Customer Experience in December 2013.  WG was reminded of Dreist's discrimination complaint when he complained to HR representative Luanne Gutermuth in February 2014 and Division Head Tanya Hudson in Fall 2014, and to Coates in approximately January or February 2015.  WG had simply ignored Mr. Dreist's complaint until he made that complaint made in front of a panel of five HR representatives, thereby forcing WG to pay attention to it.  Even then WG failed to investigate the matter at all.  WG never gave Dreist the opportunity to elaborate on his complaint or to rebut the statements of the discriminators.

V.    <u>WG's Alleged Reasons Are Riddled with Evidence of Pretext</u>.

The Fourth Circuit has recognized that because a particular prima facie case may vary depending on relevant facts and context, a plaintiff may have the option of satisfying a prima facie case by establishing that the adverse employment action occurred "under circumstances that give rise to a reasonable inference of discrimination."  *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 230 (4th Cir. 1999).  Dreist's termination occurred under such circumstances.  Where there is "substantial" evidence of biased motivation, a plaintiff can establish a prima facie case of discrimination without proceeding under the *McDonnell Douglas* burden-shifting analysis; "very little" evidence of discriminatory motive is needed in order to raise genuine issue of material fact regarding pretext.  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998). Nonetheless, Dreist can also show pretext under the *McDonnell Douglas* pretext framework.

Proof that the employer's reasons are illogical and inconsistent may "considerably assist" plaintiff's case because it suggests the employer had cause to hide its true reasons, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000).  UPS's contentions have been at times illogical, inconsistent, and sometimes dishonest.

A.   <u>Changing rationale</u>.  WG's rationale for its termination decision has changed.  The sole reason Coates forwarded the video to HR was concern that it was "derogatory and racist."  The sole reason WG gave Dreist when it terminated his employment was that the video  was "derogatory and racist."  The sole reason WG gave the EEOC was that Dreist's actions were "viewed as derogatory and racist."   Exh. 6 at 7.  At summary judgment, WG insinuates that Dreist  was fired for a plethora of performance-related reasons.

B.   <u>False Statements</u>.  WG claims that Dreist withdrew his application for Manager, Customer Care when he did not.  WG claims that Dreist never complained of race

discrimination prior to March 11, 2015, when he did.  WG claims that Dreist only claimed of a

hostile environment (e.g. being left out of staff meetings) when Dreist complained of disparate

treatment.  WG claims Dreist made his complaint "after being told the video was grounds for

termination" when WG had not suggested the possibility of termination and had not decided to

terminate.  WG claims that Emily Roller made the decision to terminate Dreist when she only

wrote the termination letter when told to.  These false statements are evidence of pretext.

      C.    <u>Discrepancies</u>.  WG has tries to portray Dreist as a racist when, in 35

years, WG has never received a complaint that this is so, when nobody who works with him

thinks that (Coates Dep. 136), when he has previously been rated as doing a very good job

supervising a diverse work force, and when he immediately apologized when he learned that the

webpage for the video included racially offensive words (an apology WG did not relay to those

allegedly offended.)

    WG terminated Dreist for sending a "racist" video when Dreist sent a link to a harmless,

jocular video that is not racist, (a video Coates never communicated with Dreist about).

    Hudson claims that after Dreist interviewed for the Manager, Customer Experience

position she "questioned if Dreist had the proper judgment and tact for a management position

focused on direct customer interaction."  Doc 4-2, p. 4, ¶ 13.  Yet, for months following that

interview, Hudson continued to have Dreist represent WG to the DC Public Service Commission,

testify on behalf of WG, and daily interact with WG customers without expressing concern or

caution to Dreist about how he communicated.  Dreist St. p.6, ¶20; Hudson Dep. 103-04.

    Dreist's performance appraisal comments on ability to communicate, teamwork, and

technical knowledge and skills stand in stark contrast to his low interview scores.  Hudson signed

Dreist's performance appraisals and led his interview.

Coates's many vague complaints in the February 23 performance memo stand in contrast to what Coates's said to Dreist regarding those matters (nothing).

Coates requested HR help in writing a performance warning for Dreist without communicating to HR or Hudson Dreist's response to Coates's February 23 performance memo.

Rodriguez forwarded Dreist's request for a confidential meeting to discuss departmental issues to HR, allegedly because Rodriguez was not in the Director's position.  However, WG had announced Rodriguez as the new director (Brown Dep. 65-67); Rodriguez was sitting in the director's office; and Rodriguez was being included on emails from Coates and HR about Dreist.

WG has been evasive and contradictory about the date of the termination decision. (Before Dreist's final discrimination complaint on March 11? or just before his April 14 termination?) WG has been contradictory about whether the March 11 meeting was merely a part of the investigation or a meeting called to announce Dreist's termination.

WG told Dreist it would investigate his discrimination complaint, but WG's alleged "investigation" did not include one interview with Dreist where he was given either the opportunity to provide detail about his discrimination belief or a response to Hudson's and Coates's statements.  Dreist explicitly complained of disparate treatment yet WG investigated only a hostile environment claim.

      D.    <u>Timing</u>.  Very shortly after Dreist complained of race discrimination to Hudson, Hudson excluded Dreist from an interview for one position and gave him a baseless low interview rating for another position.  A very short time after Dreist complained of race discrimi-nation to Coates, Coates issued a baseless performance memo to Dreist.  During the busy season,

Coates assigned Dreist nonessential tasks and gave him just 30 days to complete them.  More than a year later, Coates' group has not begun to complete them.  Coates Dep. 85-86, 170-71.  Coates waited seven weeks to refer the video link to HR.  (Even then, Coates did not discuss it with Dreist.)

E.    <u>Failure to follow WG's policies and practices</u>.  Rodriguez claims Dreist was insubordinate to ask him for a meeting to discuss his concerns, when WG policy permits employees to complain of discrimination to any manager.  Brown Dep 70-78. (That Rodriguez forwarded the email to the ombudsman who handles EEO matters is evidence that Rodriguez understood Dreist's request to relate to his discrimination complaint.)

WG skipped all other disciplinary options, Dreist St. ¶8;  Brown Dep. 172-75,  and headed straight to termination even though Dreist had 35 years with company, had never been accused of racism, lacked intent to send a racially offensive communication, and promptly apologized when he learned of the inappropriate comments on the webpage.  The punishment WG meted out did not fit the infraction, if there was an infraction.  See Dreist St. p.4, ¶8.

F.    <u>Better treatment of worse behavior</u>.   Some employees who purposefully use the "n" word are only counseled.  "Some of the guys call each other [the "n" word], and it's considered okay in today's world."  Brown Dep. 193-97.  Coates merely counseled another employee who called a co-worker the "n" word on at least one and possibly two occasions.  Dreist St. 31-32, ¶124.  Dreist St. pp. 31-32, ¶124; pp. 26-27, ¶99; Coates Dep. 14.  If Darshell Jackson (a member of management on Dreist's team) called a coworker the "n" word, Brown believes an appropriate punishment would have been to put her on warning.  Brown Dep. 198-99.  It would not surprise Brown that a manager who calls her direct report a "bitch" is told to go

29

apologize.  Id. 201-03.

Brown testified that Atkinson recommended termination because "he felt [the video] was inappropriate," but not every employee who does something inappropriate is terminated. Brown Dep 119.  Some who violate the IT policy are given only a written warning.  Id. 182-85. Managers are not required to tell HR when they give informal oral warnings.  Id. 204-05.   The only three people terminated for IT violations in the last 15 years are Dreist and the two who downloaded and shared large amounts of pornography.  Brown Dep. 189, 205; Exh. 8, 0349-50. Brown knows of no other employees terminated for doing something on accident.  Brown Dep. 193.  Employees who are fired for abandoning their jobs may be hired back.  Id. 205-06.  WG meted out lesser punishments to employees with various intentional wrongdoing.  See Dreist St. pp. 31-33, ¶¶ 123-138.

CONCLUSION

Plainly, WG had a high tolerance for race discrimination, and zero tolerance for race discrimination complaints.  WG's "investigation" into Dreist's discrimination complaints was nothing more than a sham to protecting the employer from liability rather than to remedy the behavior purportedly investigated.  Defendant's motion for summary judgment should be denied.

Respectfully submitted,

_/s/_____

August 16, 2016                    Sharon Fast Gustafson
                                   Attorney at Law, PLC
                                   Virginia Bar No. 32800
                                   6047 N. 25th Street
                                   Arlington, Virginia  22207
                                   (703) 527-0147
                                   sharon.fast.gustafson@gmail.com
                                   Attorney for Plaintiff Douglas Dreist

30

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via ECF this 16th day of August

2016 to counsel for defendants:

> J. Jonathan Schraub (#1736)
> George R. Pitts
> Sarah A. Bucovetsky
> Sands Anderson PC
> 1497 Chain Bridge Road, Suite 202
> McLean, Virginia 22101


> _____/s/_____
> Sharon Fast Gustafson